

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 27, 2023**

_____
**United States Bankruptcy Judge**

_____

### United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Larry C. Talley, Jr., | § | Case No. 20-32101-swe-7 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| ReMa Energy, LLC, | § | |
| Plaintiff, | § | |
| v. | § | Adv. No. 20-3131-swe |
| | § | |
| Texas Permian Oil & Gas Co., Inc., | § | |
| and Larry C. Talley, Jr., | § | |
| Defendants. | § | |
| | § | |
| | § | |
| ReMa Energy, LLC, | § | |
| Plaintiff, | § | |
| v. | § | Adv. No. 20-3139-swe |
| | § | (Consolidated) |
| Larry C. Talley, Jr., | § | |
| Defendant. | § | |

_____
### *Findings of fact and conclusions of law*
_____

The Debtor is a promoter of oil and gas deals who does business through his wholly owned entity Texas Permian Oil and Gas Company, Inc. ("**Texas Permian**"). The Plaintiff is an investor. Over the course of their

1

roughly five-year business relationship, the Plaintiff entered into numerous contracts with Texas Permian relating to a variety of oil and gas projects and transferred substantial sums of money to Texas Permian pursuant to those contracts. Some of the projects that Texas Permian worked on with the Plaintiff were successful, but many were not.

In these consolidated actions, the Plaintiff is (1) asserting breach-of-contract and fraud claims against Texas Permian, (2) attempting to hold the Debtor liable for those claims against Texas Permian under theories of agency and alter ego, and (3) seeking a declaration that any claims for which the Debtor is liable to the Plaintiff are nondischargeable. For the reasons set forth below, the Court finds and concludes that the Plaintiff has not satisfied its burden of proof for any of its claims.

## I.  Jurisdiction and Venue

This Court has jurisdiction over the parties and claims asserted in these proceedings under 28 U.S.C. § 1334. The claims against the Debtor are core matters under 28 U.S.C. § 157(b)(2)(B) and (I), as they involve allowance or disallowance of claims against the estate and determinations as to the dischargeability of particular debts. The claims against Texas Permian are at least related to the Debtor's bankruptcy case under 28 U.S.C. § 157(a), and this bankruptcy court may enter final orders and judgments in this case under 28 U.S.C. § 157(c)(2) because the parties have consented, explicitly or implicitly. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015) (holding that bankruptcy courts may adjudicate noncore proceedings with the consent of the parties and that such consent may be implied).[1]

---

[1] Though no longer technically a defendant in the removed action against Texas Permian, the Debtor expressly consented to the entry of final orders and judgments by the bankruptcy court on noncore matters. *See Notice of Removal*, Docket No. 1, ¶ 9. At trial, the Court raised some issues regarding jurisdiction, and the parties took the position that the bankruptcy court should proceed with trial. In addition, in post-trial briefing urging the Court to find it has jurisdiction over this matter, the Plaintiff—represented by capable and experienced bankruptcy counsel—stressed that this matter is ripe for ruling and did not make any mention of not consenting to the bankruptcy court entering final orders and judgments. *ReMa Energy LLP's Brief on Subject Matter Jurisdiction*, Docket No. 59, at 3. Nevertheless, if the District Court disagrees and believes the bankruptcy court lacks authority to enter these findings of fact and conclusions of law, this Court asks that these findings and conclusions be construed as proposed findings and conclusions.

2

Venue for these adversary proceedings is proper pursuant to 28 U.S.C. § 1409(a).

## II.  Procedural History

On August 3, 2020, the Debtor filed a voluntary chapter 11 petition, thereby initiating the above-captioned bankruptcy case. Ten days later, the Plaintiff filed a lawsuit (the "**State Court Lawsuit**") against Texas Permian and the Debtor in the 68th Judicial District Court of Dallas County, Texas.[2] In the State Court Lawsuit, the Plaintiff asserted a claim for breach of contract against Texas Permian and claims for fraud, breach of fiduciary duty, conversion, and accounting against both Texas Permian and the Debtor. Within a week of the filing of the State Court Lawsuit, the Debtor filed a suggestion of bankruptcy, and the Plaintiff promptly filed a notice of nonsuit with respect to the claims against the Debtor. The state court then entered an order dismissing the claims against the Debtor without prejudice to refiling. On October 27, 2020, the Debtor filed a notice of removal, which caused the remainder of the State Court Lawsuit to be removed to this Court.[3]

On November 5, 2020, the Plaintiff filed an adversary proceeding in this Court (the "**523 Action**")[4] seeking a determination that certain alleged debts owed by the Debtor to the Plaintiff are not dischargeable pursuant to sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code. The State Court Lawsuit and the 523 Action are somewhat intertwined because the claims that the Plaintiff has asserted against Texas Permian in the State Court Lawsuit are the same claims that the Plaintiff is asserting are nondischargeable liabilities of the Debtor because, the Plaintiff contends, the Debtor is liable for the debts of Texas Permian under theories of agency or alter ego.

The Plaintiff filed a first amended complaint in the 523 Action adding causes of action under section 727 of the Bankruptcy Code, but that

---

[2] The State Court Lawsuit appears to have been filed in violation of the automatic stay of 11 U.S.C. § 362. At trial, however, counsel for the Debtor confirmed that the Debtor wanted to proceed with trial and is not seeking any remedies for violation of the automatic stay with regard to the State Court Lawsuit.

[3] The removed State Court Lawsuit was assigned adversary proceeding number 20-3131 in this Court.

[4] The 523 Action was assigned adversary proceeding number 20-3139.

complaint was dismissed without prejudice.[5] The Plaintiff filed a second amended complaint that withdrew the cause of action under section 523(a)(4) and asserted causes of action under sections 523(a)(2)(A) and 727(a),[6] but the section 727(a) actions were later dismissed.[7] As a result, the only remaining count in the 523 Action seeks a determination that certain alleged debts owed by the Debtor to the Plaintiff are not dischargeable pursuant to section 523(a)(2)(A) because they are allegedly debts for money obtained by false pretenses, false representations, or actual fraud.

Based on a motion filed by the Debtor, the Court consolidated the State Court Lawsuit and the 523 Action for trial.[8] The parties submitted a *Joint Pretrial Order* that was signed and entered by the Court,[9] and trial was held on August 22, 23, 24, 25, and 29, 2022. After trial, the Court took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[10]

## III.   Findings of Fact

### A.      The Parties

Texas Permian was in the business of oil and gas exploration and development. Various individuals and entities participated with Texas Permian on various projects, with such arrangements generally memorialized in participation agreements.

The Debtor is the sole owner of Texas Permian, and at all times relevant to this action, Texas Permian was acting through the Debtor.

The Plaintiff is an oil and gas investment vehicle formed by Mike Whelan in 2009. Whelan was introduced to the Debtor in 2013, and the

---

[5] *See* Case No. 20-3139, Docket Nos. 15 and 26.

[6] Case No. 20-3139, Docket No. 28.

[7] Case No. 20-3139, Docket No. 37.

[8] Case No. 20-3131, Docket No. 10.

[9] Case No. 20-3131, Docket No. 40.

[10] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa.*

Plaintiff and Texas Permian began doing business together shortly thereafter.

## B.    The Relevant Transactions

The Plaintiff invested in several of Texas Permian's oil and gas projects, but only some of those projects are the subject of these lawsuits. The projects at issue fall into two categories, which the Plaintiff has referred to as "investments not fulfilled" and "diverted payments."

### 1. *Investments Allegedly Not Fulfilled*

In several instances, the Plaintiff claims that the Debtor represented to the Plaintiff that funds paid by the Plaintiff were to be used for specific wells or leases, but the funds were instead used by the Debtor for personal expenses. The Debtor generally claims that the funds Texas Permian received from the Plaintiff were in exchange for interests in leases or other consideration described in the contracts but that there were no promises or obligations to use the funds received from the Plaintiff in any particular way. The Plaintiff specifically identified four projects that it considered investments not fulfilled, and the Court will discuss each project in turn.

### a.  The Legacy Resources Project and the MICP Project

In July 2016, the Plaintiff and Texas Permian entered into a letter agreement to acquire certain leases in Andrews County, Texas with the intention of then drilling lateral wells (the "**Legacy Resources Project**").[11] In accordance with their letter agreement, the Plaintiff transferred $1,165,000 to Texas Permian. At trial, Whelan testified that he believes that when the Plaintiff entered into the letter agreement for the Legacy Resources Project and invested $1,165,000, the Debtor intended to obtain the leases for the Legacy Resources Project.

Later, however, the Debtor advised the Plaintiff that Texas Permian was unable to secure the leases for the Legacy Resources Project. The Plaintiff accepted the Debtor's proposal to transition the $1,165,000 invested in the Legacy Resources Project to another project in Andrews

---

[11] Pl.'s Ex. 1.

County known as the Mission Impossible / Caruth Park Project (the "**MICP Project**").

On July 7, 2017, the Plaintiff and Texas Permian entered into a letter agreement regarding the MICP Project, which was meant to replace the Legacy Resources Project letter agreement.[12] Under the MICP Project letter agreement, the Plaintiff was entitled to certain rights and interests, which the Plaintiff did receive.

At trial, Whelan testified once again that he believes that when the Plaintiff entered into the letter agreement for the MICP Project, the Debtor intended to obtain the leases for the project, and in fact did obtain some leases. The Debtor also testified that he worked on this project and that Texas Permian obtained leases. In March 2019, though, the Plaintiff requested the return of its investment in the MICP Project based on a lack of progress. The funds were not returned, Texas Permian was not able to obtain all of the leases needed for the project, and the leases that were obtained for this project expired in 2020.

### b. The Feris #1 Project

In mid-2017, Texas Permian proposed drilling a San Andres test well in Andrews County, Texas, and in July 2017, the Plaintiff and Texas Permian entered into a participation agreement with the stated intention of developing a leasehold interest and drilling a prospect well (the "**Feris #1 Participation Agreement**" for the "**Feris #1 Project**").[13] In accordance with the Feris #1 Participation Agreement, the Plaintiff transferred $287,500 to Texas Permian. The Feris #1 Participation Agreement specifies that most of the $287,500 related to anticipated drilling costs. The Feris #1 Participation Agreement also specifies a working interest and net revenue interest that the Plaintiff was to receive in the prospect well in exchange for its investment. The Plaintiff claims there was also a written representation by the Debtor in an e-mail prior the signing of the Feris #1 Participation Agreement that the prospect well would be permitted and drilled within the next ninety days, but that document was never put into evidence. The Debtor testified that he did not specifically recall sending such an e-mail, but he may

---

[12] Pl.'s Ex. 7.

[13] Pl.'s Ex. 10.

have and that, in any event, when the Feris #1 Participation Agreement was signed, he did intend to drill the prospect well. Compared to the representation the Plaintiff claims the Debtor made in an e-mail, the drilling requirement on page four of the Feris #1 Participation Agreement was more modest, requiring Texas Permian to "use its best efforts" to commence drilling operations on one or more of the prospect wells without unreasonable delay.

The Debtor testified that he worked on the Feris #1 Project for roughly a year and was able to obtain some, but not all, of the mineral interests necessary to drill the prospect well. The prospect well was not drilled. Whelan testified that after ninety days, the Plaintiff requested the return of the investment under the Feris #1 Participation Agreement based on a lack of progress, but the funds were not returned.

### c. The Betty Steen Project

In late 2017, Texas Permian proposed redevelopment of an oil and gas field, and in December 2017, Texas Permian and the Plaintiff entered into a letter agreement under which the parties would develop the Betty Steen Lease located in Hidalgo County, Texas (the "**Betty Steen Letter Agreement**" for the "**Betty Steen Project**").[14] In accordance with the Betty Steen Letter Agreement, the Plaintiff transferred $646,022 to Texas Permian. Under the Betty Steen Letter Agreement, the Plaintiff was to receive a working interest and a net revenue interest before payout in the Betty Steen Lease, on which Texas Permian had already done significant work. There was no allegation at trial that the Plaintiff did not receive these interests.

The Betty Steen Letter Agreement stated the completion of the Betty Steen #2 and Betty Steen #9 wells would begin in January 2018, but it did not. Later in 2018, the Plaintiff requested a refund of the $646,022 transferred to Texas Permian in accordance with the Betty Steen Letter Agreement. The Plaintiff did not receive a refund.

### d. The University Lands Leases

In September 2018, Texas Permian was awarded certain leases in Andrews County, Texas (the "**University Lands Leases**"). The plan for

---

[14] Pl.'s Ex. 12.

the University Lands Leases was to purchase them and then quickly re-sell them. Whelan testified that the Debtor told him that a close geologist associate of his had a working relationship with a potential buyer interested in Andrews County prospects, and that a deal for the University Lands Leases would be done by November 2018.

On September 26, 2018, Texas Permian and the Plaintiff entered into a letter agreement under which the parties would acquire the University Lands Leases and market them for sale (the "**University Lands Letter Agreement**").[15] In accordance with the University Lands Letter Agreement, the Plaintiff transferred $657,584.60 to Texas Permian, and Texas Permian acquired the University Lands Leases. Under the University Lands Letter Agreement, the Plaintiff was entitled to receive an 80% ownership interest in the University Lands Leases in exchange for a contribution of $657,584.60 while Texas Permian was entitled to receive a 20% ownership interest in the University Lands Leases in exchange for a contribution of $154,396.05. There was no allegation at trial that the Plaintiff did not receive its interest in the University Lands Leases. There was also, however, no evidence at trial that Texas Permian made a cash contribution of $154,396.05 after execution of the University Lands Letter Agreement.

The quick sale of the University Lands Leases did not materialize. Despite Texas Permian's efforts to find another buyer, the University Lands Leases were not sold and have since expired.

### 2. Allegedly Diverted Payments

In addition to complaining about allegedly unfulfilled investments, the Plaintiff also complains of several instances in which it transferred funds to Texas Permian for specific work to be performed by a third-party operator and claims that Texas Permian diverted those funds for improper uses rather than passing them on to the third-party operator as required.

As a bit of background, Texas Permian did not actually perform drilling work or contract with drilling contractors. Instead, Texas Permian engaged Kebo Oil and Gas, Inc. ("**Kebo**") to provide the drilling, logistical, and service support for projects. The relationship between Texas

---

[15] Pl.'s Ex. 17.

Permian and Kebo spans more than two decades and includes many pro-
jects in which the Plaintiff did not participate. For projects in which the
Plaintiff was participating, Kebo would provide Authorizations for Ex-
penditures ("**AFEs**") and Joint Interest Billing statements ("**JIBs**") to
Texas Permian. Under an AFE, a working interest holder, such as the
Plaintiff, would be notified of payments that were required for a partic-
ular task or series of tasks related to a well.

The Plaintiff claims that the Debtor required payments due from the
Plaintiff to Kebo under the AFEs to be paid to Texas Permian rather
than to Kebo and that Texas Permian then failed to transfer the funds
to Kebo and instead the Debtor used those funds—in the total amount
of $1,248,950.20—for his personal benefit. The Plaintiff made signifi-
cantly more payments than those that are at issue in this litigation dur-
ing the course of its business relationship with Texas Permian, but the
Plaintiff identified five payments made to Texas Permian pursuant to
AFEs that are at issue (the "**AFE Payments**"):

- A payment of $137,500.00 on June 30, 2015, related to the Soto
  19-1 well (the "**Soto Well**");[16]

- A payment of $176,280.00 on April 2, 2016, related to the Chil-
  dress 15 Unit #1 well (the "**Childress Well**");[17]

- A payment of $94,045.00 on September 19, 2016, related to the
  Childress Well;[18]

- A payment of $1,408,024.95 on May 9, 2018, related to the Owens
  Snoot #1 well (the "**Owens Snoot Well**"), $605,457.95 of which
  was allegedly not transferred to Kebo;[19] and

- A payment of $235,667.25 on October 6, 2018, related to the Chil-
  dress Well.[20]

Whelan testified that in the third quarter of 2018, the Plaintiff started
getting JIBs from Kebo that did not make sense in light of the amounts

---

[16] *See* Pl.'s Exs. 19, 20, and 21.

[17] *See* Pl.'s Exs. 22, 23, 24, and 25.

[18] *See* Pl.'s Exs. 26, 27, and 28.

[19] *See* Pl.'s Exs. 29, 30, 31, 32, and 43.

[20] *See* Pl.'s Exs. 33, 34, and 35.

that had been paid to Texas Permian. After a meeting that included Kebo, Texas Permian, and the Plaintiff, they agreed that an accountant would be brought in to assist.

Kebo retained W.A. Waterman & Co. ("**Waterman**"), an oil and gas accounting firm, to conduct a review of the joint-interest accounting associated with five wells, three of which were the subject of the AFE Payments. Royce Porter, a vice president at Waterman, helped prepare the report that resulted from Waterman's review of the joint-interest accounting (the "**April 2020 Waterman Report**").[21]

After Waterman completed the April 2020 Waterman Report, the Plaintiff retained Waterman to produce a supplemental report (the "**July 2020 Waterman Report**"), which was revised to find $1,248,950.20 in unapplied AFE payments from the Plaintiff to Texas Permian.[22] That is, the July 2020 Waterman Report indicated that the AFE Payments were made by the Plaintiff to Texas Permian but were not applied in Kebo's ledger to amounts that the Plaintiff owed to Kebo.

The July 2020 Waterman Report dealt with many of the parties' accounting and legal issues. Among those issues was one of contract interpretation because the relevant participation agreements had language regarding "turnkey" arrangements, but the parties each had their own interpretation of when the turnkey obligations would end. Rather than taking a position on some of the legal disputes between the parties, the July 2020 Waterman Report simply noted the parties' positions.

At trial, the parties disagreed about the exact nature of the July 2020 Waterman Report. The July 2020 Waterman Report indicates on its face that it is the "ReMa Energy Response." Whelan testified that the July 2020 Waterman Report was the result of Waterman supplementing its own work product based on evidence of the AFE Payments, which Waterman was previously unaware of. The Debtor argued that the July 2020 Waterman Report was not actually a report from Waterman but was more properly characterized as the Plaintiff's rebuttal to the April 2020 Waterman Report.

---

[21] Def.'s Ex. LL.

[22] Pl.'s Ex. 43.

In his testimony, Porter supported Whelan's testimony that the July 2020 Waterman Report contained revisions based on the previously unknown AFE Payments but also characterized the July 2020 Waterman Report as the Plaintiff's rebuttal to the April 2020 Waterman Report. Porter further testified that writing a rebuttal to his own report sounded like a conflict to him for which he had to get written conflict waivers from the parties.

The parties disputed not only how to characterize the July 2020 Waterman Report, but also who drafted portions of it. For instance, there are several blocks of red text in the July 2020 Waterman Report indicating that they are the "Rema Response" to a section of the report. Whelan testified that those comments in red were Waterman's language, writing, and work, not Whelan's. Porter, however, testified that the red text was not Waterman's independent analysis but was just language drafted by Whelan and inserted in the report as the Plaintiff's position. On this point, Porter's testimony was more credible than Whelan's.

The Debtor further argued that even if the findings of the July 2020 Waterman Report are credible, they do not support a breach-of-contract or fraud claim because the July 2020 Waterman Report does not address how much Texas Permian paid to Kebo but rather only addresses the accounting issue of how Texas Permian's payments to Kebo were applied to individual projects. The Debtor testified that Texas Permian was making a lot of payments to Kebo during the relevant time period, and he believes the issue simply has to do with how Kebo applied those payments.

The Debtor's argument that the unapplied AFE Payments may represent more of an accounting issue found some support in the testimony of Ken Boester, the CEO of Kebo. Boester explained that Kebo was working on many wells with Texas Permian and that it is possible for there to be reconciliations with customers that involve crediting payments associated with one well against another. When Texas Permian paid Kebo, Texas Permian would generally pay Kebo in large round numbers and would sometimes prepay for projects. Payments from Texas Permian generally were not in the amount of specific invoices or necessarily associated with a single well. Texas Permian would usually, but not always, allocate how payments to Kebo were supposed to be applied.

Untangling the legal and accounting issues with the AFE Payments—
including whether Texas Permian was required to immediately remit
those funds to Kebo, whether Texas Permian was required to remit the
entire amount of those funds to Kebo, and how Kebo should have ac-
counted for payments from Texas Permian—is significantly complicated
by the fact that there were participation agreements and joint operating
agreements for the drilling and completion of the Childress Well, the
Owens Snoot Well, and the Soto Well, but none of those governing agree-
ments were offered into evidence at trial.

## C.    The Debtor's Use of the Plaintiff's Funds

At trial, the Plaintiff took the position that Texas Permian was required
to use funds received from the Plaintiff in particular ways and that a
failure to do so constituted a breach of contract, fraud, or both. In sup-
port of the Plaintiff's allegation that Texas Permian used the Plaintiff's
funds for the Debtor's personal expenses instead of for the intended pur-
poses, the Plaintiff presented the testimony of William Dennis Brown.
Brown has significant experience with investigating fraud and was en-
gaged by the Plaintiff to conduct a forensic investigation regarding how
the Debtor and Texas Permian spent the funds invested by the Plaintiff.
In conducting his investigation, Brown reviewed the records for six bank
accounts either owned or controlled by the Debtor or Texas Permian, the
July 2020 Waterman Report, the complaint in the 523 Action, and some
of the discovery in this lawsuit, such as the Debtor's discovery responses
and a transcript of a deposition of the Debtor. Brown purported to trace
the Plaintiff's funds and categorized their ultimate use in one of three
ways: (1) "verified," which meant Brown had information sufficient to
establish a relationship between the use of the funds and the Plaintiff's
investment, (2) "unverified," which meant Brown was not able to deter-
mine whether the use of the funds was related to the Plaintiff's invest-
ment, or (3) "not related / personal," which meant Brown concluded that
the funds were either used for the Debtor's personal expenses or other
expenses unrelated to the Plaintiff's investment.

In his original report, Brown opined that the Debtor misappropriated at
least $343,325 of the Plaintiff's funds and presumed that another
$1,762,503.14 received from the Plaintiff was used for purposes unre-
lated to the Plaintiff's investments and therefore was misappropriated
as well. In a supplemental report, Brown conducted a further review of
the disbursement of $1,100,000 that he previously categorized as

"unverified" and opined that the majority of that money was also used either for the Debtor's personal expenses or for other purposes unrelated to the Plaintiff's investment. Brown further opined that the movement of the Plaintiff's funds between bank accounts concealed the true nature of the use of the funds and that the Debtor's movement of funds between bank accounts had the indicia of fraud.

The Court did not find Brown's testimony helpful for several reasons. Brown made a series of sweeping assumptions in his analysis and generally showed a heavy bias towards finding funds had been misappropriated. For instance, despite not reviewing the contracts at issue, Brown made assumptions about how money was required to be spent, and if the money was not spent as Brown believed it should have been, Brown concluded that the money was misappropriated. In addition, Brown made assumptions about which expenditures were personal based on very limited information, primarily what he could see from a check or a bank statement. For instance, Brown did not know whether credit card payments were business or personal expenses, so he assumed credit card payments represented a misappropriation of funds. As another example, Brown classified large payments from the invested funds to Kebo as "unverified," which he then opined should be considered presumably misappropriated. During cross-examination, Brown acknowledged his view that the burden of showing that each expenditure was proper was on the Debtor.

More fundamentally, though, the Court does not believe the tracing analysis that Brown employed to determine how the Plaintiff's funds were used is helpful in this case. Brown's tracing analysis examined bank accounts that had pre-existing balances and money from other sources moving through them and assigned the Plaintiff's funds to specific disbursements from those accounts based on the order in which deposits and disbursements were made. If Texas Permian paid expenses for Plaintiff-related projects from existing cash balances or from other cash flows, it was ignored in Brown's analysis. Worse, though, is that if Texas Permian paid expenses for Plaintiff-related projects from other funds (that is, from funds not deposited by the Plaintiff), then whatever the funds that Brown was tracing from the Plaintiff's deposit were eventually used for would be considered a misappropriation under Brown's analysis, ignoring that cash is fungible. So, unless Texas Permian spent the exact funds that Brown was tracing on expenses that Brown could

clearly tell were related to one of the Plaintiff's projects, Brown either concluded or presumed that Texas Permian was misappropriating funds. This analysis might have been more helpful if there had been a requirement that the Plaintiff's funds be segregated or held in trust, but if such a requirement existed, the Plaintiff has not shown the Court where that requirement comes from.

Brown did not attempt to answer the broader question of how much Texas Permian spent on valid business expenses related to projects it was working on with the Plaintiff and instead focused myopically on what happened to specific dollars received from the Plaintiff, which does not seem to provide useful evidence for any issue before the Court. Brown's additional opinion that the Debtor's movement of funds between bank accounts indicates fraud, without more explanation, is similarly unhelpful. The number of entities and bank accounts in this case does not stand out as unusual.

Overall, Brown's testimony does not aid the Court in determining whether the Debtor or Texas Permian breached contracts or defrauded the Plaintiff. If anything, the evidence presented through Brown that at least hundreds of thousands of dollars were paid to Kebo or used for other valid expenses related to the Plaintiff's projects weighs in favor of a finding that the Debtor was not defrauding the Plaintiff.

## IV.  Conclusions of Law

The Plaintiff alleges that Texas Permian is liable to it for breach of contract and fraud, that the Debtor should be held liable for Texas Permian's obligations to the Plaintiff, and that the Debtor's resulting obligations to the Plaintiff should be declared nondischargeable. The Plaintiff bears the burden of proving the elements of each of these claims by a preponderance of the evidence.

### A.     The Plaintiff's Claims Against Texas Permian

In the State Court Lawsuit, the Plaintiff asserted claims against Texas Permian for breach of contract, fraud, breach of fiduciary duty, conversion, and accounting. Based on the Joint Pretrial Order, it does not appear that the Plaintiff is still pursuing the claims for breach of fiduciary duty, conversion, and accounting, and counsel for the Plaintiff confirmed at trial that with respect to Texas Permian, the Plaintiff is only pursuing

claims for breach of contract and fraud.[23] The Court will therefore limit its discussion to the breach-of-contract and fraud claims and finds the other claims have been abandoned.

### 1. *Breach of Contract*

To prevail on a claim for breach of contract under Texas law, the plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). The Plaintiff alleged breaches of each of the contracts discussed at trial. For purposes of the Court's analysis, each of the contracts for the projects in which Texas Permian is alleged to have failed to fulfill the investment will be discussed individually, but the contracts related to the AFE Payments can be discussed as a group.

### a. The Legacy Resources Project and the MICP Project

While the parties' ultimate aspirations for the MICP Project were not realized, Texas Permian attempted performance under the MICP Project letter agreement, which replaced the Legacy Resources Project letter agreement. Indeed, the evidence shows that Texas Permian obtained leases for the MICP Project, and Whelan confirmed that the Plaintiff received the rights and interests it was entitled to under the MICP Project letter agreement. Nevertheless, the Plaintiff is asserting a claim for breach of a contract provision requiring the return of unused funds.

The Legacy Resources Project and the MICP Project are governed by their respective letter agreements. The Plaintiff directed the Court to

---

[23] The Plaintiff only asserted a claim for fraud against Texas Permian, not the Debtor. That is, there is a count for fraud in the State Court Lawsuit in which Texas Permian is the sole defendant, but there is no separate count for a direct fraud claim in the 523 Action in which the Debtor is the defendant. For this reason, the Court only discusses a claim for fraud against Texas Permian, but as a practical matter, a claim for fraud against Texas Permian and a claim for fraud against the Debtor would be indistinguishable because the Debtor controlled Texas Permian and all of the fraud allegations against Texas Permian are based on actions taken by the Debtor. This is one of the reasons that, despite the unusual procedural posture, the Court believes it has subject matter jurisdiction over the State Court Lawsuit. That is, the Plaintiff's fraud claim against Texas Permian is inextricably linked to, and may have an effect on, the Plaintiff's section 523(a)(2)(A) claim against the Debtor.

(1) language in the Legacy Resources Project letter agreement saying that if Texas Permian is unable to acquire the well bore and acreage, unused funds would be remitted back, pro rata, to the Plaintiff and (2) language in the MICP Project letter agreement saying that it merges and incorporates the previous letter agreement. Based on this language, the Debtor's testimony that Texas Permian ultimately was not able to obtain the well bore and acreage for the MICP Project, and the fact that Texas Permian did not return the Plaintiff's investment upon request, the Plaintiff claims Texas Permian has breached the contract by not returning any unused funds. There was no evidence, however, that there were any unused funds, or if there were, what amount of funds were unused. Rather, the evidence showed that Texas Permian acquired leases in connection with the MICP Project. Despite this evidence, the Plaintiff still seeks a return of the full amount of its investment and has not given the Court any other damage model or calculation.

With respect to the Legacy Resources Project and the MICP Project, the Plaintiff has shown the existence of a valid contract and performance by the Plaintiff, but because the Plaintiff has not established the existence or amount of any unused funds, it has not adequately shown a breach of the contract by Texas Permian or damages sustained by the Plaintiff because of the alleged breach.

### b. The Feris #1 Project

As it did with the MICP Project, Texas Permian attempted to complete the Feris #1 Project, but the parties' aspirations were not realized. The Debtor worked on the Feris #1 Project for roughly a year and was able to obtain some, but not all, of the mineral interests necessary to drill the prospect well. The Plaintiff is asserting a claim for the entire amount of its investment.

There are a few problems with the Plaintiff's breach-of-contract claim with respect to the Feris #1 Project. One problem is that it is not clear what provision of the Feris #1 Participation Agreement the Plaintiff asserts was breached. It is true that the prospect well contemplated by the Feris #1 Participation Agreement was never drilled, but the drilling requirement on page four of the Feris #1 Participation Agreement only required Texas Permian to use its best efforts to commence drilling operations on one or more of the prospect wells without unreasonable delay, which Texas Permian did. Although Texas Permian did not return

the Plaintiff's investment, the Court was not directed to a contractual provision that would require Texas Permian to do so. Page three of the Feris #1 Participation Agreement allocates the Plaintiff's investment to different portions of the Feris #1 Project, but nothing in the Feris #1 Participation Agreement requires that certain amounts of the Plaintiff's funds actually be used for particular tasks or states that funds must be returned if no well is drilled.

A bigger problem with the Plaintiff's claim is that the entire contract governing the relationship between the parties with respect to the Feris #1 Project is not in evidence. In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument, and to achieve this objective, courts must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.*

While the Feris #1 Participation Agreement is part of the contract between the Plaintiff and Texas Permian with respect to the Feris #1 Project, it is not the entire contract. On page two of the Feris #1 Participation Agreement, there is a reference to an operating agreement that is supposed to be attached as Exhibit B. That operating agreement, which governs aspects of the relationship between the Plaintiff and Texas Permian with respect to the Feris #1 Project and is referred to in several sections of the Feris #1 Participation Agreement, is not attached to the participation agreement and is not otherwise in evidence. Page eight of the Feris #1 Participation Agreement also appears to be incomplete in the Court's evidentiary record.

With respect to the Feris #1 Project, the Plaintiff has shown the existence of a valid contract between Texas Permian and the Plaintiff, but it has not shown what all of the terms of that contract are. Without knowing the complete terms of the contract, the Court is not able to determine whether the Plaintiff fully performed, whether Texas Permian breached, and, even assuming Texas Permian breached, what the damages would be. Even if the Court were to consider the Feris #1 Participation Agreement as a standalone contract, which it clearly is not, the Plaintiff still has not shown a breach of the terms of that agreement.

### c. The Betty Steen Project

The Betty Steen Project is another instance in which Texas Permian attempted to complete a project, but the parties' aspirations were not realized, and yet the Plaintiff is asserting a claim for the entire amount of its investment. As with the Feris #1 Project, the complete contract was not in evidence, and even if it were, it is not clear what contractual provision was breached.

While the Betty Steen Letter Agreement is part of the contract between the Plaintiff and Texas Permian with respect to the Betty Steen Project, it is not the entire contract. The first paragraph of the Betty Steen Letter Agreement states that the Plaintiff and Texas Permian are entering into an agreement "under the terms set forth below and the Participation Agreement." There is no participation agreement for the Betty Steen Project in evidence. There was also credible testimony at trial that there is a joint operating agreement governing the Betty Steen Project, but that operating agreement is not in evidence, either.

Even considering the Betty Steen Letter Agreement in isolation, it is not clear that Texas Permian breached its obligations or how damages could be calculated. The Betty Steen Letter Agreement contains a paragraph that identifies interests in the Betty Steen Lease as the consideration the Plaintiff is to receive in exchange for the investment, and there was no allegation at trial that the Plaintiff did not receive these interests. In the next paragraph, there is a statement that the work program would commence in January 2018 with completion of the Betty Steen wells and a statement that over the coming months, additional completions would be proposed as well as new drilling locations to access the Frio Sands and Vicksburg Sands. It is not clear whether the latter paragraph was part of the consideration for the Plaintiff's investment, a representation made by one party to another, or simply a statement of the parties' expectations. It is also not clear how damages would be calculated under this agreement if the Plaintiff received the Betty Steen Lease interests but the proposed wells were not drilled or were not drilled on schedule. The Plaintiff is nevertheless demanding a complete return of its investment.

With respect to the Betty Steen Project, the Plaintiff has shown the existence of a valid contract between Texas Permian and the Plaintiff, but it has not shown what all of the terms of that contract are. Without

18

knowing the complete terms of the contract, the Court is not able to determine whether the Plaintiff fully performed, whether Texas Permian breached, and, even assuming Texas Permian breached, what the damages would be. Even if the Court were to consider the Betty Steen Letter Agreement as a standalone contract, which it clearly is not, the Plaintiff still has not shown a breach of the terms of that agreement.

### d. The University Lands Leases

The attempted sale of the University Lands Leases is another instance in which Texas Permian attempted to complete a project, but the parties' aspirations were not realized, and yet the Plaintiff is asserting a claim for the entire amount of its investment. Once again, however, the Court is not able to find a breach of the contract between the Plaintiff and Texas Permian.

The parties' agreement regarding the acquisition, marketing, and sale of the University Lands Leases is governed by the University Lands Letter Agreement. While the University Lands Letter Agreement contemplated a sale of the University Lands Leases by May 31, 2019, it also provided that if such a sale did not occur, the parties would determine an alternative strategy to monetize or develop the University Lands Leases.

The Plaintiff claims that Texas Permian breached the University Lands Letter Agreement by not contributing $154,396.05 in cash and that the Plaintiff is therefore entitled to damages in the amount of its entire investment in the University Lands Leases. The provision in the University Lands Letter Agreement that the Plaintiff is referring to simply states that "[Texas Permian's] contribution of $154,396.05 represents and constitutes a 20% ownership interest in the subject Leases." The Plaintiff correctly states that it cannot find, and Texas Permian has not identified, a cash transfer of $154,396.05 after execution of the University Lands Letter Agreement that would show Texas Permian's contribution. Texas Permian argues that there was no requirement in the University Lands Letter Agreement that the contribution be made after execution of the letter agreement or that the contribution be made in cash, and the Court agrees. Furthermore, even if Texas Permian were required to make a cash contribution and Texas Permian breached that obligation, it is not clear how the Plaintiff would have suffered damages because of that breach. The University Lands Leases were acquired and

marketed for sale. They did not sell and have since expired. There is no evidence that Texas Permian's making a cash contribution would have changed that result.

With respect to the University Lands Letter Agreement, the Plaintiff has shown the existence of a valid contract and performance by the Plaintiff, but it has not adequately shown a breach of the contract by Texas Permian or damages sustained by the Plaintiff because of the alleged breach.

### e. The AFE Payments

In the case of the AFE Payments, the Plaintiff contends that it transferred funds to Texas Permian for specific work to be performed by Kebo but Texas Permian diverted those funds for improper uses rather than passing them on to Kebo as required. There are several problems with the Plaintiff's breach-of-contract claims based on the AFE Payments, though, beginning with the fact that there were participation agreements and joint operating agreements for the drilling and completion of the wells for which the AFEs were issued, but none of those governing agreements were offered into evidence at trial. So the Plaintiff made the AFE Payments based on written contracts, but the Court does not know what the parties' obligations under those contracts were. What the Court can tell is that the parties disagreed over the proper interpretation of some of the provisions in the contracts at issue. The July 2020 Waterman Report noted the parties' competing interpretations of contract provisions and the financial impact they would have, but the Court does not have the language of those provisions to determine which interpretations were correct.

Moreover, the Court cannot find that Texas Permian had a contractual obligation to transfer the full amount of the AFE Payments to Kebo. The Plaintiff provided testimony that payments to Texas Permian for AFEs were required to be immediately passed on to Kebo, but Texas Permian contends that its obligation under turnkey arrangements was not to pass the funds on to Kebo but instead to pay the costs of the project identified in the AFE, which the Debtor testified Texas Permian did. The Debtor's testimony regarding Texas Permian's obligation to pay certain expenses rather than passing on a particular dollar amount was credible, but the best evidence of the parties' respective obligations would have been the contracts at issue.

20

Even if the Court were able to determine Texas Permian's contractual obligations regarding the AFE Payments, it is still not clear that this is more than an accounting issue. Brown provided a tracing analysis, but as previously noted, that inappropriately restrictive analysis does little to show that Texas Permian did not pay Kebo for the work identified in the related AFEs. The testimony of the Debtor and Boester regarding the relationship between Texas Permian and Kebo makes it entirely plausible that the Plaintiff's problems with Kebo were the result of an accounting or allocation issue rather than Texas Permian's failure to pay.

As perhaps an alternative to examining the contracts themselves, the Plaintiff attempted to use the July 2020 Waterman Report to show what may be owing under the contracts at issue, but that evidence is not sufficient for the Plaintiff to sustain a breach-of-contract claim for a few reasons. First, the July 2020 Waterman Report is difficult for the Court to rely on because, at times, it appears to be more a statement of the Plaintiff's contentions than the analysis and opinion of an impartial expert. Second, the July 2020 Waterman Report discusses how Texas Permian's payments to Kebo were applied, not what Texas Permian paid to Kebo. At most, the July 2020 Waterman Report shows that amounts were not applied to the Plaintiff's account with Kebo, not that Texas Permian did not pay those funds to Kebo. Finally, and most importantly, the July 2020 Waterman Report acknowledged that there were unresolved disputes over the interpretation of language in the contracts at issue; the Court does not have those contracts to examine.

With respect to the AFE Payments, the Plaintiff has shown the existence of valid contracts between Texas Permian and the Plaintiff, but it has not shown what the terms of those contracts are. Without knowing the complete terms of the contracts, the Court is not able to determine whether the Plaintiff fully performed, whether Texas Permian breached, and, even assuming Texas Permian breached, what the damages would be.

For these reasons, each of the Plaintiff's claims for breach of contract fail.

### 2. *Fraud*

To recover on an action for fraud under Texas law, the plaintiff must prove that (1) a material representation was made; (2) it was false; (3) when the speaker made the representation he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made it with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff thereby suffered injury. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

Whelan testified that most of the alleged misrepresentations were in the written contracts themselves, but the Court has had trouble finding them. For instance, the Plaintiff claims there is a representation in the University Lands Letter Agreement that Texas Permian would contribute $154,396.05 in cash after execution of the letter agreement, but the Court does not read the University Lands Letter Agreement to contain such a representation.

The Plaintiff also alleged that the Debtor represented to the Plaintiff that Texas Permian would send the AFE Payments to Kebo, but if that representation was in a written contract, it was not admitted into evidence. The Debtor testified credibly (1) that he did not make such a representation and (2) because the AFE Payments related to turnkey arrangements, Texas Permian's obligation was to pay Kebo for certain expenses rather than pass on a particular dollar amount to Kebo. With the evidence available at trial, the Court cannot find that the Debtor represented to the Plaintiff that Texas Permian would simply send the entire amount of the AFE Payments to Kebo. And even if the Debtor had made such a representation to the Plaintiff, the evidence does not show that it was false because the evidence focused on how payments from Texas Permian to Kebo were applied on Kebo's ledger, not whether the funds received from the Plaintiff were included in the many payments made from Texas Permian to Kebo during the relevant timeframe.

The Plaintiff also alleged that the Debtor represented that the funds the Plaintiff invested for each project would only be used on that project. The Court is again generally unable to find such a representation in the

contracts that have been entered into evidence,[24] and the Debtor testified credibly that he made no such representation. Based on the available evidence, it seems more likely that Texas Permian was allowed to use the necessary amount of funds received for a project to accomplish that project and use the balance of the funds however it wished. After all, it would be reasonable for Texas Permian to be compensated for things such as the Debtor's efforts and the interests that were transferred to the Plaintiff in some of the transactions.

Outside of the contracts, the Plaintiff claims there was also a written representation by the Debtor in an e-mail prior to the signing of the Feris #1 Participation Agreement that the prospect well would be permitted and drilled within the next ninety days, but that document was never put into evidence. The Debtor testified credibly that he did not specifically recall sending such an e-mail, but he may have and that, in any event, at the time the Feris #1 Participation Agreement was signed, he did intend to drill the prospect well. If the Debtor made a representation in an e-mail regarding the timing of when the well would be drilled, such representation was false, but the Court does not find that when the Debtor made the representation, he knew it was false or made it recklessly without any knowledge of the truth.

In general, the Court believes that most of the alleged misrepresentations either were not made or came more in the form of a statement of aspirations for a project or an expectation that a project would be successful. Even if some of the representations made by the Debtor were false, though, the Court does not find that when the Debtor made those representations, he knew they were false or made them recklessly without any knowledge of the truth. For several of the projects, Whelan acknowledged that the Debtor intended to do what he said he would at the outset, even if it did not later come to fruition.

The Court believes the Debtor intended to perform under all of the projects that Texas Permian entered into with the Plaintiff. This finding is supported by the great weight of the evidence presented at trial, including the Debtor's credible testimony regarding his meaningful efforts on

---

[24] The Legacy Resources Project letter agreement is arguably an exception because it required the return of any unused funds. As the Court previously explained, though, the Plaintiff did not establish that this representation was false because the Plaintiff did not establish the existence of unused funds.

each of the projects, Brown's testimony that at least hundreds of thousands of dollars were being paid for valid expenses related to the Plaintiff's projects, and the fact that some of the projects were successful. The Plaintiff's efforts to show that the Debtor had fraudulent intent, such as through Brown's tracing analysis, were not persuasive. The Plaintiff has succeeded in showing that it was a party to several unsuccessful business deals with Texas Permian, but it has fallen well short of showing that either Texas Permian or the Debtor have defrauded it.

## B.   The Debtor's Liability for the Debts of Texas Permian

In addition to asserting claims against Texas Permian for breach of contract and fraud, the Plaintiff has asked the Court to find that the Debtor is liable for Texas Permian's obligations to the Plaintiff either as the agent or the alter ego of Texas Permian. While the Court has already concluded that Texas Permian is not liable to the Plaintiff for breach of contract or fraud, the Court will still discuss the Plaintiff's efforts to hold the Debtor liable for the debts of Texas Permian.

The Plaintiff's first argument is that a corporation's agent is personally liable for his own fraudulent acts, so no piercing of the corporate veil is required. For the reasons previously stated, the Court finds that the Debtor has not committed fraudulent acts, so the Plaintiff's first theory of liability fails.

The Plaintiff also argues that under *Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487 (Tex. App.—Texarkana 2002, pet. denied), the Court should find that the Debtor is the alter ego of Texas Permian because there is such a unity between Texas Permian and the Debtor that the separateness of the corporate form has ceased and holding only Texas Permian liable would result in injustice. The evidence in this case falls well short of the standard identified by the Plaintiff.

Several of the projects involved in these lawsuits were not successful, causing the Plaintiff to lose a significant amount of money, but the Debtor still appeared to be conducting a legitimate business through his entities and generally observing corporate formalities. The Debtor and Texas Permian maintained separate bank accounts, and the Plaintiff has not shown that disbursements from those accounts or transfers between them were improper. The Debtor was the sole owner of Texas

Permian and controlled its day-to-day activities, but that is not uncom-
mon for small businesses. At trial, it appeared as though Texas Permian
did not have the best accounting records, but it was not so egregious as
to support a finding of alter ego.

Moreover, the Court did not get a full view of the relationship between
the Debtor and Texas Permian or how the entity was being used because
the focus of trial was only on a subset of Texas Permian's projects with
the Plaintiff, not the entirety of Texas Permian's projects with the Plain-
tiff, and not the entirety of Texas Permian's projects with other parties.
Texas Permian had other ongoing business activities, as partially evi-
denced by the relationship between Texas Permian and Kebo, which
spans more than two decades and includes many projects in which the
Plaintiff did not participate.

Furthermore, section 21.223 of the Texas Business Organizations Code
provides as follows:

> (a) A holder of shares, an owner of any beneficial in-
> terest in shares, or a subscriber for shares whose subscrip-
> tion has been accepted, or any affiliate of such a holder,
> owner, or subscriber of the corporation, may not be held li-
> able to the corporation or its obligees with respect to:
>
> . . . .
>
> (2) any contractual obligation of the corporation
> or any matter relating to or arising from the obligation on
> the basis that the holder, beneficial owner, subscriber, or
> affiliate is or was the alter ego of the corporation or on the
> basis of actual or constructive fraud, a sham to perpetrate
> a fraud, or other similar theory; or
>
> (3) any obligation of the corporation on the basis
> of the failure of the corporation to observe any corporate
> formality. . .
>
> . . . .
>
> (b) Subsection (a)(2) does not prevent or limit the li-
> ability of a holder, beneficial owner, subscriber, or affiliate
> if the obligee demonstrates that the holder, beneficial
> owner, subscriber, or affiliate caused the corporation to be

> used for the purpose of perpetrating and did perpetrate an
> actual fraud on the obligee primarily for the direct personal
> benefit of the holder, beneficial owner, subscriber, or affili-
> ate.

The Court does not find such a unity between Texas Permian and the
Debtor that the separateness of the corporate form has ceased and that
holding only Texas Permian liable would result in injustice. Neither
does the Court find that the Debtor caused Texas Permian to be used for
the purpose of perpetrating an actual fraud on the Plaintiff. For these
reasons, the Plaintiff has not satisfied its burden of showing that the
Debtor should be liable for any obligations of Texas Permian.

## C.    Dischargeability of the Plaintiff's Claims Against the Debtor

While the Court has already concluded that Texas Permian is not liable
to the Plaintiff for breach of contract or fraud and that the Plaintiff's
attempts to hold the Debtor liable for the debts of Texas Permian fail,
for the sake of completeness, the Court will still address the Plaintiff's
request for a declaration that any of its viable claims against the Debtor
are nondischargeable.

In an action to determine the dischargeability of a debt, the party pro-
moting the exception to discharge must prove by a preponderance of the
evidence that the debt is nondischargeable. *FNFS, Ltd. v. Harwood (In
re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Grogan v. Garner*,
498 U.S. 279, 286 (1991)). Exceptions to discharge must be strictly con-
strued against the creditor and liberally construed in favor of the debtor.
*Id.* (citing *Hudson v. Raggio (In re Hudson)*, 107 F.3d 355, 356 (5th Cir.
1997)). In this case, the Plaintiff is only seeking a determination of non-
dischargeability under section 523(a)(2)(A) of the Bankruptcy Code.

To obtain relief under section 523(a)(2)(A), the Plaintiff must show that
the Debtor owes the Plaintiff a debt "for money, property, services, or an
extension, renewal, or refinancing of credit" that was "obtained by false
pretenses, a false representation, or actual fraud." The Fifth Circuit has
distinguished the elements of "false pretenses and false representa-
tions" from "actual fraud." False representations and false pretenses
within the meaning of section 523(a)(2)(A) require that the creditor
prove (1) the existence of a knowing and fraudulent falsehood,

(2) describing past or current facts, (3) that was relied upon by the creditor. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995).

To support a cause of action for actual fraud under section 523(a)(2)(A), a creditor must prove that (1) the debtor made a representation; (2) the debtor knew that the representation was false at the time it was made; (3) the debtor made the representation with the intent and purpose to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as the proximate result of its reliance on the representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017). In some circumstances, it is also possible for the term "actual fraud" as used in section 523(a)(2)(A) to encompass fraudulent-conveyance schemes, even when those schemes do not involve a false representation by the debtor. *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 366 (2016).

The Plaintiff's claims under section 523(a)(2)(A) fail because, as discussed above, the Court does not find that the Debtor made any knowingly false representations, does not find that the Debtor made any representations with the intent to deceive the Plaintiff, and does not find that the Debtor perpetrated any kind of a fraudulent scheme.

## V.  Conclusion

This case appears to be less about fraud and more about a few failed projects and the Plaintiff's dissatisfaction with the Debtor's efforts on those projects. In the Joint Pretrial Order, the Plaintiff claimed that the Debtor simply did not work on many of these projects after Texas Permian received the Plaintiff's funds, but the evidence shows that was not the case. The Debtor did his best to make each of the projects that the Plaintiff invested in successful. While it is possible that if the relevant contracts were in evidence, the Court may have found a breach of contract, there does not appear to have been fraud. The Court is somewhat troubled by the fact that the Debtor did not provide an accounting of what money was spent on the Plaintiff's projects and did not provide his own reconciliation of what funds were paid to Kebo, but that does not change the fact that the Plaintiff has simply failed to satisfy its burden with respect the causes of action in the State Court Lawsuit and the 523 Action. For the reasons stated herein, the Court will separately enter judgment in favor of the Debtor and Texas Permian.

### End of Findings of Fact and Conclusions of Law ###